1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   LANCE JETT,

11          Plaintiff,                    No. CIV S-02-2036 GEB JFM P

12      vs.

13   M. PENNER, et al.,

14          Defendants.                   FINDINGS & RECOMMENDATIONS

15   _____/

16          Plaintiff is a state prisoner proceeding through counsel with a civil rights action

17   pursuant to 42 U.S.C. § 1983.[1]  Defendants are two doctors and a prison warden.  Plaintiff claims

18   that defendants violated his rights under the Eighth Amendment and Fourteenth Amendments by

19   failing to provide treatment for a broken thumb.  Plaintiff also raises two pendent state law

20   medical malpractice claims arising from the same set of facts, one against defendant Dr. Peterson

21   and one against defendant Dr. Penner, and a pendent state law claim under California

22   /////

23

24          [1]  This action was filed on September 17, 2002 by plaintiff proceeding pro se.  On March
     30, 2004, the district court granted summary judgment for defendants and judgment was entered.
     Plaintiff appealed the judgment, and the United States Court of Appeals for the Ninth Circuit
25   appointed counsel to represent plaintiff  On March 9, 2006, the United States Court of Appeals
     reversed the district court's ruling and remanded the matter for further proceedings.  Jett v.
26   Penner, 439 F.3d 1091 (9th Cir. 2006).

                                            1

1  Government Code § 845.6 against all three defendants.[2]  This matter is before the court on

2  defendants' motion for summary judgment, or in the alternative, summary adjudication of

3  issues.[3]

4  SUMMARY JUDGMENT STANDARDS UNDER RULE 56

5         Summary judgment is appropriate when it is demonstrated that there exists "no

6  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

7  matter of law."  Fed. R. Civ. P. 56(c).

8         Under summary judgment practice, the moving party

9      always bears the initial responsibility of informing the district court
of the basis for its motion, and identifying those portions of "the

10     pleadings, depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any," which it believes

11     demonstrate the absence of a genuine issue of material fact.

12 Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

13 nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

14 judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

15 to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

16 after adequate time for discovery and upon motion, against a party who fails to make a showing

17 sufficient to establish the existence of an element essential to that party's case, and on which that

18 party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

19 concerning an essential element of the nonmoving party's case necessarily renders all other facts

20 immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

21 whatever is before the district court demonstrates that the standard for entry of summary

22 judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

23 _____

24 [2] This action is proceeding on plaintiff's first amended complaint, docket # 91, filed
pursuant to this court's November 16, 2006 oral ruling.  (See Order filed March 8, 2007.)

25 [3] This matter came on for hearing before the undersigned on May 17, 2007.  Frank J.
26 Riebli, Esq. appeared as counsel for plaintiff.  James W. Walter, Deputy Attorney General,
appeared as counsel for defendants.

2

1    If the moving party meets its initial responsibility, the burden then shifts to the

2    opposing party to establish that a genuine issue as to any material fact actually does exist.  See

3    Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

4    establish the existence of this factual dispute, the opposing party may not rely upon the

5    allegations or denials of its pleadings but is required to tender evidence of specific facts in the

6    form of affidavits, and/or admissible discovery material, in support of its contention that the

7    dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

8    must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

9    of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

10   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

11   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

12   return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

13   1436 (9th Cir. 1987).

14   In the endeavor to establish the existence of a factual dispute, the opposing party

15   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

16   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

17   versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

18   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

19   genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

20   committee's note on 1963 amendments).

21   In resolving the summary judgment motion, the court examines the pleadings,

22   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

23   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

24   477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

25   court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

26   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

1   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

2   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

3   1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

4   show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

5   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

6   'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

7                                                      ANALYSIS

8   I.  Facts

9            The following facts are taken from the March 9, 2006 decision of the United

10  States Court of Appeals for the Ninth Circuit in this case:

11           On October 27, 2001, Mr. Jett fell from the top bunk to the floor of
             his prison cell at CSP-Sacramento and injured his right thumb.
12           Because the injury occurred on a Saturday and there were no
             doctors on staff at the prison, Mr. Jett was taken to Mercy Hospital
13           emergency room in Folsom, California, where he was seen by Dr.
             Kendrick Johnson. Dr. Johnson diagnosed Mr. Jett with a fracture
14           to the first metacarpal of the right thumb. Dr. Johnson prescribed
             pain medicine, placed Mr. Jett's thumb in a temporary SPICA
15           splint, and advised Mr. Jett verbally and in written aftercare
             instructions not to use his right hand and to "... see [an] orthopedic
16           doctor early this week for recheck appointment." When Mr. Jett
             returned to CSP-Sacramento, the written aftercare instructions
17           were given to a medical technical assistant.

18           Three days later, on October 30, 2001, Mr. Jett was seen at the
             prison by Charles I. Hooper, D.O. Dr. Hooper continued Mr. Jett
19           on pain medication. Mr. Jett's hand was still too swollen to place
             in a permanent cast.
20
             Throughout November and most of December 2001, Mr. Jett was
21           not seen by a physician. He was in pain and relayed his need to be
             seen by an orthopedist to set and cast his fractured thumb by
22           notifying a medical technical assistant, submitting medical slips,
             sending a letter to Dr. Penner on December 8, 2001, filing a formal
23           grievance on December 11, 2001, and sending a letter to Dr.
             Peterson on December 13, 2001.
24
             On December 24, 2001,-almost two months after the injury and
25           diagnosis of the fractured thumb-Mr. Jett was seen by Dr. Penner.
             Dr. Penner requested an x-ray and noted that Mr. Jett's hand was
26           still in the SPICA splint. The x-ray occurred on December 27,

                                                          4

2001, and the radiology report prepared by Dr. Andrew Nicks states, "fracture of the base of the first metacarpal is again identified. The fracture is oblique which extends into the margin of the articular surface. The position of the fragments appears to be unchanged. Healing is underway.... The fracture is healing. Deformity and slight angulation is stable." Dr. Penner reviewed the x-ray on January 30, 2002, noting, "healing fracture."

Following the December 24, 2001, consult with Dr. Penner, Mr. Jett continued to submit medical slips asking to be sent to an orthopedist to have his fractured thumb set and cast. On January 2, 2002, Dr. Penner removed Mr. Jett's splint, commenting in his notes, "I reviewed xrays which showed no ~~obvious~~ fracture malalignment." (Alteration in original.) On January 18, 2002, Dr. Penner again saw Mr. Jett and ordered another x-ray to "[rule out] nonunion of fractures." Dr. Penner prescribed additional pain medication.

Following a February 1, 2002, visit, Dr. Penner noted that he wanted an x-ray of the old fracture or to obtain a copy of a previous x-ray, as well as to obtain an orthopedist consult to follow up with the SPICA cast for the fracture. This orthopedic consultation request was marked "routine" and was not submitted by Dr. Penner until March 13, 2002.

The x-ray ordered by Dr. Penner on January 18, 2002, was taken on February 14, 2002. The radiology report for the x-ray states:

[a]n old fracture deformity is seen at the base of the first metacarpal. Spurring is seen projecting from the base of the metacarpal. The fracture is well-healed. The articular surface is irregular. Mild, probably post traumatic, degenerative change is present at the metacarpophalangeal joint. No dislocation or significant subluxation is seen. . . . Old fracture deformity involving the first metacarpal.

The radiology report for a March 22, 2002, x-ray contained similar findings and conclusions.

In February, Mr. Jett wrote a letter to Warden Pliler to tell her that, even though he had put in medical slips, he had not received a cast for his fractured hand. On February 19, 2002, a physical therapist advised Mr. Jett to begin hand physical therapy. Several days later, Mr. Jett was examined by Dr. Penner on February 25, 2002. Dr. Penner noted that the base of Mr. Jett's thumb was tender and Mr. Jett had "limited opposition now." Id. This was Mr. Jett's last visit with Dr. Penner until August 20, 2002.

Mr. Jett was seen by Dr. Hooper on March 15, 2002. Dr. Hooper ordered an x-ray, a consult with an orthopedic hand specialist, and

/////

pain medicine. The requested x-ray occurred on March 22, 2002. Dr. Ronald Hetrick reviewed the x-ray and found:

[t]here is a deformity of the proximal end of the metacarpal to the thumb which appears well-healed. There is an osteophyte present. This represents an old fracture with secondary osteoarthritis ... There is no evidence for an acute fracture or dislocation, but there is also a deformity of the distal end of the second metacarpal consistent with a previous old healed fracture.

On April 9, 2002, a physician-not Dr. Penner-submitted an "urgent" Request for Services for outpatient "hand ortho surgeon." On April 19, 2002, Dr. Fong, an orthopedic specialist in Manteca, California, examined Mr. Jett's hand. Dr. Fong determined Mr. Jett should be referred to a hand specialist because the fracture had healed improperly.

Mr. Jett was next seen by Dr. Penner on August 20, 2002, with two subsequent visits on October 7, 2002, and November 12, 2002. On each of these occasions, Dr. Penner noted that a hand specialist consultation was pending.

On December 4, 2002, Mr. Jett was transferred to Pleasant Valley State Prison where he continued to take steps to obtain treatment for his hand. Ultimately, on May 30, 2003,-more than a year after Dr. Fong, the orthopedic specialist, recommended Mr. Jett be referred to a hand specialist and more than nineteen months since the injury to his hand-Mr. Jett was seen by Dr. Jeffrey L. Tanji at U.C. Davis Medical Center. Based on the current record, it is unclear what treatment Dr. Tanji provided; however, Dr. Tanji's letter to a doctor at Pleasant Valley State Prison following the May 30, 2003, appointment reflects Dr. Tanji planned to discuss pin placement with Mr. Jett to help repair the "quite ... bad fracture."

Jett, 439 F.3d at 1094-95.

II. Defendants' Motion

Defendants seek summary judgment on several grounds. First, they contend that defendant Peterson did not have a doctor-patient relationship with plaintiff and therefore cannot be held liable on plaintiff's medical malpractice claim. Second, they contend for a variety of reasons that none of the defendants violated plaintiff's rights under the Eighth Amendment in connection with the management and treatment of plaintiff's broken thumb. Defendants also seek summary adjudication of five issues: (1) whether defendant Peterson can be held liable for medical malpractice as a matter of law; (2) whether defendant Peterson violated plaintiff's rights

6

1  under the Eighth Amendment; (3) whether defendant Penner's actions prior to December 24,

2  2001 violated plaintiff's rights under the Eighth Amendment; (4) whether defendant Penner's

3  actions after December 24, 2001 violated the Eighth Amendment; and (5) whether defendant

4  Penner can be held responsible for any acts or omissions related to plaintiff's broken thumb after

5  plaintiff transferred from California State Prison-Sacramento on or about December 4, 2002.

6  (Amended Notice of Motion, filed April 13, 2007, at 2.)  The first four issues are subsumed by

7  defendants' motion for summary judgment, and each of those is addressed in turn.

8          Defendants make no separate argument in support of their request for summary

9  adjudication of the fifth issue.  Their only reference to this issue is as follows:

> Mr. Jett transferred from CSP Sac. to Pleasant Valley State Prison
> in [sic] December 4, 2002.  For reasons known only to Mr. Jett,
> Plaintiff does not believe that any of the doctors who treated him at
> Pleasant Valley, or the other two prisons where he was transferred
> following his stay at CSP Sac., bear any responsibility for not
> ensuring that Mr. Jett received his medical appointment with a
> hand surgeon, or the ultimate surgery that he underwent, for the
> years that this procedure took.[4]

15  (Memorandum of Points and Authorities in Support of Defendants' Motion for Summary

16  Judgment or, in the Alternative, for Summary Adjudication (Defendants' Memorandum of Points

17  and Authorities), filed April 12, 2007 at 7.)  On this motion defendants have not met their burden

18  of demonstrating defendant Penner's entitlement to summary adjudication.

19          A.  <u>State Law Medical Malpractice Claim Against Defendant Peterson</u>

20          Defendant Peterson seeks summary judgment on plaintiff's medical malpractice

21  claim contending that a physician-patient relationship is an essential element of a medical

22  malpractice claim under California law and plaintiff cannot establish the existence of such a

23  relationship with defendant Peterson.  Plaintiff argues that the evidence shows that defendant

24  Peterson did have a duty of care to plaintiff sufficient to support a medical malpractice claim.

---

[4]  Plaintiff's hand surgery did not occur until the spring of 2005.  (First Amended
Complaint, at 6.)

1   "It long has been held that an essential element of a cause of action for medical

2   malpractice is a physician-patient relationship giving rise to a duty of care." <u>Mero v. Sadoff</u>,

3   (1995) 31 Cal.App.4th 1466, 1471 (citing <u>Felton v. Schaeffer</u> (1991) 229 Cal.App.3d 229, 235,

4   279 Cal.Rptr. 713, review den. Aug. 1, 1991; also citing <u>Keene v. Wiggins</u> (1977) 69 Cal.App.3d

5   308, 313-314, 138 Cal.Rptr. 3.)  Under California law,

6           [w]hen the physician-patient relationship exists, either expressed or
            implied, the patient has a right to expect the physician will care for
7           and treat him with proper professional skills and will exercise
            reasonable and ordinary care and diligence toward the patient
8           (<u>Rasmussen v. Shickle</u>, 4 Cal.App.2d 426, 429-430, 41 P.2d 184).
            This does not suggest, however, a doctor is required to exercise the
9           same degree of skill toward every person he sees. The duty he owes
            to each varies with the relationship of the parties, the foreseeability
10          of injury or harm that may be expected to flow from his conduct
            and the reliance which the person may reasonably be expected to
11          place on the opinion received. A case-by-case approach is required.

12  <u>Keene v. Wiggins</u>, 69 Cal.App.3d 308, 313 (Cal.App. 1977).  As a general proposition, a

13  physician-patient relationship exists in California where the relationship between a physician and

14  a patient is created as part of, or for the purpose of, providing medical treatment.  <u>Id</u>.; <u>see</u> <u>also</u>

15  <u>McNamara v. Emmons</u>, 36 Cal.App.2d 199, 104 (Cal.App. 4 Dist. 1939).

16          Plaintiff's medical malpractice claim against defendant Peterson is grounded in

17  requests made by plaintiff for necessary medical care.  (First Amended Complaint, at 9-10.)  The

18  allegations are sufficient to ground the claim in a physician-patient relationship between plaintiff

19  and defendant Peterson.[5]  Defendant Peterson is not entitled to summary judgment on plaintiff's

20  medical malpractice claim based on the alleged absence of a doctor-patient relationship.

21  /////

22  /////

23  _____

24      [5]  As a general rule, the existence of a duty of care is a question of law.  <u>See</u> <u>Rainer v.</u>
    <u>Grossman</u>, 31 Cal.App.3d 539, 542-3 (Cal.App. 1973).  In the instant case, there are disputed
25  issues of fact concerning whether, and to what extent, defendant Peterson had notice of plaintiff's
    condition and his need for medical treatment.  The court does not resolve those questions at
    summary judgment but instead looks to the gravamen of the alleged relationship between
26  defendant Peterson and plaintiff.

B. <u>Eighth Amendment</u>

Defendants seek summary judgment on plaintiff's Eighth Amendment claim on the ground, generally, that plaintiff cannot establish that any of the defendants were deliberately indifferent to his need for adequate treatment of his broken thumb.

The standards with respect to the plaintiff's Eighth Amendment claim were set forth by the court of appeals as follows:

> Under 42 U.S.C. § 1983, to maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show "deliberate indifference to serious medical needs." <u>Estelle v. Gamble</u>, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). In the Ninth Circuit, the test for deliberate indifference consists of two parts. <u>McGuckin v. Smith</u>, 974 F.2d 1050 (9th Cir.1991), *overruled on other grounds by* <u>WMX Techs., Inc. v. Miller</u>, 104 F.3d 1133 (9th Cir.1997) (en banc). First, the plaintiff must show a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.' " <u>Id.</u> at 1059 (citing <u>Estelle</u>, 429 U.S. at 104, 97 S.Ct. 285). Second, the plaintiff must show the defendant's response to the need was deliberately indifferent. <u>Id.</u> at 1060. This second prong-defendant's response to the need was deliberately indifferent-is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. Id. Indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." <u>Id.</u> at 1059 (quoting <u>Hutchinson v. United States</u>, 838 F.2d 390, 392 (9th Cir.1988)). Yet, an "inadvertent [or negligent] failure to provide adequate medical care" alone does not state a claim under § 1983. <u>Id.</u> (citing <u>Estelle</u>, 429 U.S. at 105, 97 S.Ct. 285). A prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs. <u>Id.</u> at 1060. If the harm is an "isolated exception" to the defendant's "overall treatment of the prisoner [it] ordinarily militates against a finding of deliberate indifference." <u>Id.</u> (citations omitted).

<u>Jett</u>, 439 F.3d at 1096.

1. <u>Defendant Peterson</u>

Plaintiff's Eighth Amendment claim against defendant Peterson arises from a letter plaintiff wrote to defendant Peterson on December 13, 2001, informing him that he had

1  been unable to obtain orthopedic or any other medical care for his broken thumb and that he was

2  suffering significant pain and discomfort, and from defendant Peterson's role in a grievance

3  plaintiff filed complaining of inadequate medical care.  (First Amended Complaint, at 4-5.)

4  Defendant Peterson did not respond to the December 13, 2001 letter.  (Id. at 4.)  With respect to

5  the grievance, plaintiff alleges that, at the second level of administrative review, defendant

6  Peterson directed another physician to review plaintiff's file and conduct a "'thorough

7  investigation'" of plaintiff's claims.  (Id. at 5.)  The written report repeated "almost verbatim" the

8  statements made by defendant Penner in his first level response to plaintiff's grievance, and

9  neither defendant Peterson nor the other doctor interviewed plaintiff "to determine whether

10 Penner was reporting [plaintiff]'s condition accurately."  (Id.)  Defendant Peterson signed this

11 appeal on April 4, 2002.  (Id.)

12      Defendant Peterson seeks summary judgment on two grounds.  First, he contends

13 that since plaintiff cannot establish Dr. Peterson's liability for medical malpractice on any of the

14 theories on which he relies, Dr. Peterson "clearly cannot be found liable for deliberate

15 indifference under any of these same theories."  (Defendants' Memorandum of Points and

16 Authorities, at 12.)  This contention is without merit.

17      Second, defendant Peterson contends there is no evidence of his personal

18 involvement in the events complained of.  In support of this contention, he argues that he has

19 remained in this action because of the court of appeals' determination that plaintiff was entitled

20 to an inference that defendant Peterson had received the December 13, 2001 letter.  See Jett, at

21 1098.  Defendant Peterson contends that evidence of how he handled inmate correspondence in

22 the ordinary course of business shows that he did not receive the letter.  Defendant Peterson

23 offers his deposition testimony, at which he testified that his "habit and custom" with all letters

24 he received from inmates concerning medical care "was to make an electronic scan of the

25 document and stick it in [his] computer file."  (Defendants' Ex. H, filed April 12, 2007,

26 Transcript of Videotaped Deposition of Douglas Peterson, M.D., at 154.)  He contends he has

1  kept those files since 1998, and he further contends that he  searched all of them by plaintiff's

2  name as well as his CDC number and found no letter from plaintiff.  (Id. at 156.)

3          The court of appeals found that plaintiff was "entitled to an inference at the

4  summary judgment stage that Dr. Peterson . . . received the letter[] he swore he sent to [him]."

5  Jett, at 1098 (citing Moore v. Jackson, 123 F.3d 1082, 1087 (8th Cir. 1997)).  In Moore, the court

6  of appeal found a triable question of material fact where the plaintiff had presented evidence he

7  sent a letter to a prisoner administrator and the prison administrator averred that she had not

8  receive the letter.  See Moore, at 1084, 1087.  Dr. Peterson's evidence does not resolve the

9  question of whether he received plaintiff's December 13, 2001 letter; it simply demonstrates that

10 this is a question of material factual that must be resolved by the jury.

11         For the foregoing reasons, defendant Peterson's motion for summary judgment

12 should be denied.

13             2.  Warden Pliler

14         Plaintiff's Eighth Amendment claim against defendant Pliler arises from a letter

15 plaintiff wrote to her on February 4, 2002, informing her of difficulties he was having getting

16 medical care for his broken thumb.  (First Amended Complaint, at 5.)  Plaintiff sent the letter

17 through the prison's institutional mail system.  (Deposition of Lance Jett, April 15, 2003, at 64.)

18 Plaintiff claims that defendant Pliler "never responded to [his] letter and never took any steps to

19 ensure he received proper medical care."  (First Amended Complaint, at 5.)  Defendant Pliler

20 seeks summary judgment based on her contention that she did not receive plaintiff's letter.

21         In support of this contention, defendant Pliler presents her own deposition

22 testimony that she was not working at California State Prison-Sacramento between January 2002

23 and August 2002.  (Defendants' Ex. M, filed April 12, 2007, Transcript of Deposition of Cheryl

24 Pliler, at 53.)  She was working as the Acting Deputy Director for Parole at the headquarters of

25 the California Department of Corrections and Rehabilitation in Sacramento, California, 22.6

26 miles from the prison.  (Id.)  She contends that the chief deputy warden was in charge of the

11

1  prison during this period and had been given "a full reign of power." (Id. at 54.)  At her

2  deposition Pliler testified she was "accessible during that time for prison-related matters" but she

3  was "generally" reached by telephone and no "Warden-type mail" was forwarded to her.  (Id.)

4  She also claims that the chief deputy warden needed no authorization from her to act during that

5  time, and while he might call her "[i]f there was something questionable or something nonroutine

6  . . . he was also responsible to the regional administrator so for prison-related business, he would

7  call that person." Id. at 54-55.

8         As with defendant Peterson, the court of appeals held that plaintiff was entitled to

9  an inference that defendant Pliler had received his letter.  See Jett, at 1098 (citing Moore, supra).

10 And, as with defendant Peterson, defendant Pliler's deposition testimony does not resolve the

11 question of whether she received plaintiff's February 4, 2002 letter; it simply demonstrates that

12 this is a question of  material fact to be resolved by the jury.  For these reasons, defendant Pliler's

13 motion for summary judgment should be denied.

14                        3.  Defendant Penner

15        Defendant Penner divides his request for summary judgment into two parts.  First,

16 he contends there is no evidence that he was deliberately indifferent to plaintiff's need for

17 treatment of his thumb fracture prior to December 24, 2001, because there is no evidence that he

18 was aware of the fracture prior to that date.  Second, he contends that there is no evidence that

19 defendant Penner was deliberately indifferent to plaintiff's need for treatment of the thumb

20 fracture in the period that followed his first appointment with defendant Penner on December 24,

21 2001.

22        In support of his contention that he was unaware of plaintiff's injury before

23 December 24, 2001, defendant Penner relies on the fact that none of the "medical slips" plaintiff

24 claims to have sent to request care were uncovered during discovery and that there is no witness

25 who can corroborate plaintiff's statements that he sent the requests.  Defendant Penner argues

26 from this that the requests for medical care do not exist and that he did not know about plaintiff's

1   medical condition until the appointment on December 24, 2001.  Defendant Penner also contends

2   that he was not the physician responsible for plaintiff's care in the immediate aftermath of his

3   injury because plaintiff was in an administrative segregation unit when he was injured and

4   defendant Penner was not the physician responsible for inmates in that unit.

5          The court of appeals made the following findings with respect to Dr. Penner's

6   knowledge of plaintiff's injury prior to December 24, 2001:

7                  [A]s to whether Dr. Penner knew of Mr. Jett's fractured thumb and
                his need to see an orthopedic doctor prior to December 24, 2001,
8               there is evidence the aftercare instructions were in Mr. Jett's
                medical file, he sent medical slips, he filed a medical grievance on
9               December 11, 2001, and he sent a letter via institutional mail to Dr.
                Penner on December 8, 2001, describing his need to see an
10              orthopedic doctor to set and cast his fractured right thumb.  Dr.
                Penner denied being aware of Mr. Jett's fractured thumb until
11              December 24, 2001; however, viewing the facts in Mr. Jett's favor,
                it must be presumed that Dr. Penner received the the December 8,
12              2001, letter in a timely fashion. See Moore v. Jackson, 123 F.3d
                1082, 1087 (8th Cir.1997) ("Whether the defendant actually
13              received plaintiff's letter requesting dental care in August 1994,
                [sic] is a question of fact...."). As the party opposing the motion for
14              summary judgment, Mr. Jett is entitled to an inference that Dr.
                Penner was aware of the filed grievance, medical slips, and
15              aftercare instructions in his medical record. Accordingly, the trier
                of fact could find, prior to December 24, 2001, Dr. Penner was
16              aware of Mr. Jett's need for aftercare for his fractured thumb and
                that Dr. Penner's failure to see Mr. Jett to ensure the fracture was
17              set and cast was deliberate indifference to a serious medical
                condition.

18

19  Jett, at 1097.

20          The facts tendered by defendant Penner in support of this aspect of this motion

21  for summary judgment simply add to the evidence that must be considered and weighed by the

22  jury to determine when defendant Penner learned of plaintiff's need for medical care.  They do

23  not demonstrate his entitlement to summary judgment on this aspect of plaintiff's Eighth

24  Amendment claim against him.

25          Defendant Penner also seeks summary judgment on the ground that there is no

26  evidence that he acted with deliberate indifference to plaintiff's thumb fracture in the care that he

1 provided on and after December 24, 2001.  The court of appeals reversed the prior grant of

2 summary judgment on this claim for the following reasons:

3        [W]e find the evidence, when viewed in Mr. Jett's favor,
demonstrates the existence of a genuine issue of material fact as to
4 whether Dr. Penner's post-December 24, 2001, conduct constituted
deliberate indifference to Mr. Jett's serious medical condition. At
5 his deposition, Mr. Jett stated that Dr. Penner advised him at the
initial visit on December 24, 2001, "don't worry about it, we got it
6 all tooken [sic] care of, we know that you have to go back out [to
Mercy Hospital emergency for a follow-up]." Yet, Mr. Jett was
7 never taken to Mercy and did not see an orthopedist until April
2002, approximately six months after the injury. In response to an
8 interrogatory, Dr. Penner stated that Mr. Jett was not returned to
Mercy Hospital for a follow-up visit because CSP-Sacramento
9 generally sends patients to Manteca, its contracted facility. This
response neither explains nor excuses the fact that Mr. Jett was not
10 taken to an orthopedist at a contracted facility prior to April 2002.
In addition, "the State's responsibility to provide inmates with
11 medical care ordinarily does not conflict with competing
administrative concerns." McGuckin, 974 F.2d at 1060 (quoting
12 Hudson v. McMillian, 503 U.S. 1, 6, 112 S.Ct. 995, 117 L.Ed.2d
156 (1992)). Accordingly, if Dr. Penner decided not to request an
13 orthopedic consultation merely because Mr. Jett could not go back
to Mercy, a non-contracted facility, this is "akin to cases finding
14 deliberate indifference where prison officials and doctors
deliberately ignore[ ] the express orders of a prisoner's prior
15 physician for reasons unrelated to the medical needs of the
prisoner." Hamilton v. Endell, 981 F.2d 1062, 1066-67 (9th
16 Cir.1992) (citations omitted), *abrogated in part on other grounds
by* Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1045 (9th
17 Cir.2002); Hartsfield v. Colburn, 371 F.3d 454 (8th Cir.2004). Mr.
Jett presented sufficient information for this question to go to the
18 finder of fact.

19        Other evidence viewed in Mr. Jett's favor indicating deliberate
indifference to Mr. Jett's need to have his fractured thumb set and
20 cast consists of Mr. Jett's continued submission of medical slips to
obtain such care and Dr. Penner's decision to submit a "routine"
21 request for an orthopedic consult approximately two-and-a-half
months after his initial visit with Mr. Jett and approximately one
22 month after Dr. Penner's form was filled out. The fact finder could
infer deliberate indifference from Dr. Penner's act of striking out
23 the word "obvious," resulting in a statement of "no malalignment"
in his notes, after reviewing a radiology report which specifically
24 indicates a deformity.FN2 *See, e.g.*, Hathaway v. Coughlin, 37
F.3d 63, 68 (2d Cir.1994) (finding "[a] jury could infer deliberate
25 indifference from the fact that [the doctor] knew the extent of [the
inmate's] pain, knew that the course of treatment was largely
26 ineffective, and declined to do anything more to attempt to

improve [the inmate's] situation"). In our view, this is not a case involving differing medical opinions regarding treatment methods, *see* Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.1996), because Dr. Penner recognized, as did all other physicians who saw Mr. Jett, Mr. Jett needed to see an orthopedist, as evidenced by Dr. Penner's March 2002 request for an orthopedic consult for Mr. Jett.

FN2. In pertinent part, Dr. Penner's January 2, 2002, notes state, "I reviewed xrays which showed no obvious fracture malalignment." (alteration in original).

Finally, the record is replete with evidence showing the delay was harmful. Dr. Penner's own notes indicate the harm caused by the delay. Dr. Penner's December 24, 2001, notes state that Mr. Jett's thumb is still "healing;" whereas, his March 2002 notes state that Mr. Jett's thumb is "healed." Dr. Nicks' radiology summary for the December 27, 2001, x-ray states, "healing is underway," and the summary for the February 14, 2002, x-ray states the "fracture is well-healed." The radiology summaries clearly indicate, because the fracture did not align upon healing, the thumb was deformed; this deformity was inferentially caused by the delay in referring him to an orthopedist who could have properly set and cast his fractured thumb.

Thus, we conclude Mr. Jett presented sufficient evidence to have the finder of fact decide when Dr. Penner knew of Mr. Jett's fractured thumb and his need to have it set and cast and whether the care provided by Dr. Penner constituted deliberate indifference to Mr. Jett's serious medical need.

Jett, at 1097-98.

In support of this aspect of his motion for summary judgment, defendant Penner takes issue with the findings made by the court of appeals, contending that "discovery completed since the case was remanded proves that many of these facts asserted by Mr. Jett were either not true or were not completely briefed, leading the court of appeals to make unintentional assumptions." (Defendants' Memorandum of Points and Authorities, at 18.)  Specifically, defendant Penner contends there is no corroboration of plaintiff's testimony that defendant Penner advised plaintiff he would be sent to Mercy Hospital for a consultation and that plaintiff, in response to interrogatories, does not include this as a factual ground in support of his claim against defendant Penner.  Defendant Penner further contends that he didn't order an emergency consultation for plaintiff because when he first saw plaintiff on December 24, 2001 he believed

15

1   plaintiff's thumb was stable and therefore did not require emergency medical attention.  Dr.

2   Penner also contends that he did not believe any delay in seeing an orthopedist following the

3   December 24, 2001 visit would increase the harm to plaintiff because any harm occurred in the

4   immediate aftermath of the fracture and the failure timely to have it set and casted.  Finally,

5   defendant Penner contends he had no control over when plaintiff could be seen by an orthopedist.

6          As with several other aspects of the instant motion, defendant Penner is simply

7   adding evidentiary weight to, and rearguing, factual issues that the court of appeals has

8   determined require trial.  None of the evidence tendered by defendant Penner demonstrates

9   conclusively that he is entitled to summary judgment without trial.

10          In accordance with the above, IT IS HEREBY RECOMMENDED that

11   defendants' April 12, 2007 motion for summary judgment or in the alternative for summary

12   adjudication of issues be denied.

13          These findings and recommendations are submitted to the United States District

14   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

15   after being served with these findings and recommendations, any party may file written

16   objections with the court and serve a copy on all parties.  Such a document should be captioned

17   "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

18   failure to file objections within the specified time may waive the right to appeal the District

19   Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

20   DATED:  June 21, 2007.

21

22

23                                              UNITED STATES MAGISTRATE JUDGE

24   12
     jett2036.msj2
25

26

16